UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WILLIAM ANNARUMA,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

Civil Action No. 16-02168
HON. ALETA A. TRAUGER
U.S. District Judge
HON. R. STEVEN WHALEN
U.S. Magistrate Judge

# REPORT AND RECOMMENDATION

Plaintiff William Annaruma ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits under the Social Security Act. On January 27, 2017, Plaintiff filed a Motion for Judgment [Docket #21]. On January 30, 2018, the case was assigned to the undersigned pursuant to 28 U.S.C. § 636 for Report and Recommendation. For the reasons set forth below, I recommend that Plaintiff's Motion [Docket #21] be DENIED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on April 8, 2013, alleging disability as of December 9, 2010 (Tr. 142-143). On June 25, 2013, Plaintiff retained the services of attorney David C. Downward (Tr. 75). After the initial denial of the

claim, Plaintiff requested an administrative hearing, held on April 24, 2014 (Tr. 21). Administrative Law Judge ("ALJ") Elizabeth P. Neuhoff presided. Plaintiff, represented by attorney Chelsea Parker, testified (Tr. 28-51, 56-61) as did Vocational Expert ("VE") Rebecca Williams (Tr. 51-56). On May 7, 2015, ALJ Neuhoff found that Plaintiff did not experience any workplace limitations on or before the June 30, 2009 expiration of DIB (Tr. 12-16). On June 17, 2016, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision on August 15, 2016.

## II. BACKGROUND FACTS

Plaintiff, born July 14, 1952, was 62 when ALJ Neuhoff issued her decision (Tr. 16, 142). He completed at least four years of college and worked previously as an electronic installer (Tr. 156). His application for benefits alleges disability resulting from sarcoidosis, colitis, hypertension, arm numbness, and spine and neck problems (Tr. 155).

### A. Plaintiff's Testimony

Plaintiff testified that he moved from New York to Tennessee in 2010 (Tr. 29). He visited New York City "[e]very once in a while" to meet with friends and business connections (Tr. 29). He stated that he tried "to do some work there, as often as [he could]" (Tr. 29).

The ALJ and Plaintiff then engaged in the following exchange:

ALJ: Okay. So, Mr. Annaruma, when I read through your paperwork, you said that you became disabled on January 1, 2008? Is that date correct?

Plaintiff: No.

ALJ: Okay.

Plaintiff: It's not.

ALJ: What date do you believe you became disabled?

Plaintiff: It was around December of 2010.

ALJ: And what happened that caused you to believe you became disabled on that date?

Plaintiff: Well, I mean, it was really kind of stuff that was leading up. . . . I have a condition that elevated to a level of incapacitating me a lot. It's called sarcoidosis . . . . [also effecting the digestive system, lungs, liver, kidneys, hands, and eyes] . . . . And it started getting apparent in around 2008, 2009 . . . . But it elevated. It just kept elevating . . . . And the biggest thing that it affected that stopped me from working was that it - - I had a lot of stenosis in my spine. So I can't stand for long - - for more than five or six minutes at a time. And my hands get totally numb (Tr. 29-30).

Plaintiff reported that he took Lyrica for the condition (Tr. 30). He reported that at times that he was unable to lift a bottle without pain (Tr. 31).

*The ALJ then noted that because Plaintiff's date last insured ("DLI") for DIB eligibility was June 30, 2009, Plaintiff would "have to, obviously, dismiss [the DIB] claim" (Tr. 31, 34). She noted, in effect, that she would consider whether Plaintiff was eligible for Supplemental Security Income ("SSI") for the period after the DLI for DIB (Tr. 34).*

*Plaintiff then resumed his testimony*:

He stated that he was currently working "very sparsely" installing home stereo systems and electronic key pads (Tr. 34). He still wrote music (Tr. 35). He made $11,000 to $12,000 the previous year and expected to make the same amount in 2015 (Tr. 36). Part

of his income was derived from royalties from previously composed songs (Tr. 36). He estimated that he spent 10 hours a week working (Tr. 37).

Plaintiff reported that he stood 5' 10" and weighed 270 pounds, adding that he had gained 45 pounds in the last year due to the use of steroids (Tr. 37). He was divorced and lived alone (Tr. 38). He was able to drive, use a computer, and use Facebook (Tr. 39). Music was his great love and he enjoyed attending concerts (Tr. 39). He also enjoyed feeding and watching birds outside his house (Tr. 39).

Plaintiff received regular medical treatment and obtained good results from prescribed medication (Tr. 41). He reported that in "the last couple of years," he cashed in life insurance policies to help his financial situation (Tr. 41).

In response to questioning by his attorney, Plaintiff testified that he was involved in a car accident on December 9, 2010 (Tr. 42). Since the accident, he experienced constant back and neck pain, noting that standing for more than four or five minutes caused foot numbness (Tr. 42). He used wrist braces to combat hand numbness (Tr. 43). The back and neck conditions caused sleep disturbances (Tr. 43). He did traction every day at home (Tr. 43). He did not experience problems sitting (Tr. 43). He had a torn meniscus of the right knee, but was unable to undergo a surgical repair due to insurance limitations (Tr. 44). He experienced knee pain and infrequent knee swelling (Tr. 44). He used a knee brace (Tr. 44).

Plaintiff reported that complications of sarcoidosis affected his digestive health, noting that he now experienced a "Crohn's disease"/ colitis "kind of situation on a monthly

basis;" hand numbness; and eye inflamation (Tr. 45). He received modest pain relief from chiropractic adjustments every two weeks (Tr. 48).

Prior to disability, Plaintiff worked as an audio/video consultant and installer (Tr. 49). He also played the guitar (Tr. 50). He composed music and wrote a song that became "a big hit in the early 2000's," for which he won a Country Music Award for Song of the Year (Tr. 50).

### B. Medical Evidence

#### 1. Records Related to Plaintiff's Treatment

*The treating records refer to Plaintiff's condition well after the June 30, 2009 expiration of DIB and are included for background purposes only.*

January, 2011 treating records note Plaintiff's report that "he was well until" December 9, 2010 when his car was rear-ended (Tr. 315). Plaintiff reported neck and back pain with upper extremity tingling (Tr. 315). MRIs of the cervical and lumbar spine from the same month showed multiple disc herniations (Tr. 311, 313). Nerve conduction studies of the upper extremities were positive for moderate right CTS and and right radiculopathy (Tr. 302). Plaintiff was prescribed wrist splints (Tr. 308). Nerve conduction studies of the lower extremities showed radiculopathy of the lower extremities (Tr. 304, 306). April, 2011 records note a diagnosis of kidney stones with a recommendation for conservative care consisting of dietary changes and medical compliance (Tr. 260). July, 2011 treating records note Plaintiff's report of continuing neck pain and hand numbness (Tr. 288). October, 2011

records note a normal gait (Tr. 286).

June, 2012 imaging studies taken in response to Plaintiff's report of continued neck pain showed "end plate sclerosis" and a limited range of motion (Tr. 248). He demonstrated 5/5 muscle strength with some evidence of left CTS (Tr. 248). The following month, Plaintiff reported left upper extremity and right hip pain following a motor vehicle accident (Tr. 246). He was advised to use wrist splints (Tr. 246). A treating sources recommended a steroid injection to the left wrist and an epidural steroid injection to the cervical spine (Tr. 248). In July, 2013, Plaintiff reported breathing problems due to allergies (Tr. 264). He experienced good results from a steroid injection to the left wrist (Tr. 246). An eye exam from the same month, noting the diagnosis of sarcoidosis, showed a developing cataract but no changes in vision (Tr. 261-263). In August, 2012, Plaintiff reported no long-term improvement from the steroid injections to the wrist (Tr. 243). Notes from the following month state that Plaintiff experienced neck pain since the December, 2010 accident (Tr. 242). Nerve conduction studies of the upper extremities showed cervical nerve root compression and CTS resulting from the December, 2010 accident (Tr. 235-236). Plaintiff reported uncoordinated hand movement (Tr. 242). He was re-referred for physical therapy in October, 2012 (Tr. 241). Imaging studies of the right knee showed a small joint effusion but no other abnormalities (Tr. 239). An MRI of the right knee showed a tear of the medial meniscus (Tr. 239). Plaintiff opted for conservative treatment of the knee problems (Tr. 237). He reported an improvement in the knee condition the following month (Tr. 231).

January, 2013 imaging studies of the cervical spine were consistent with earlier studies (Tr. 229). April, 2013 records show a normal range of knee motion (Tr. 223). Records by Federica Beatrice Angel, M.D. from the same month noted that Plaintiff was diagnosed with sarcoidosis 10 years earlier and had experienced "acute recurrent inflammation" since 1998 (Tr. 222). He noted that his vision was stable but that he suffered from depression (Tr. 222). Dr. Angel noted a 15-year history of recurrent bilateral anterior uveitis (Tr. 222). The same month, a chest x-ray was consistent with the diagnosis of sarcoidosis with a normal heart size and no pleural effusion (Tr. 220). Plaintiff reported a diagnosis of sarcoidosis at age 50 (Tr. 217). The following month, Plaintiff reported that he was doing "okay" but had knee "flare ups" periodically (Tr. 216). The same month, he was diagnosed with obstructive sleep apnea (Tr. 215). Notes from the following month state diagnoses of Crohn's disease, hypertension, claustrophobia, and acquired (left) trigger finger (Tr. 209). Imaging studies of the chest from the following month show that nodules observed in a prior study were "not as prominent" (Tr. 207). Results were consistent with stage I pulmonary sarcoidosis (Tr. 207).

In October, 2013, Ali E. Guy, M.D. opined that Plaintiff had "clearly sustained a permanent partial disability causally related to [an] accident of December 9, 2010" (Tr. 284-285). He noted that imaging studies showed multiple herniations of the cervical and lumbar spine; radiculopathy of the cervical and lumbar spine; and bilateral CTS (Tr. 284). He noted that the accident exacerbated the pre-existing condition of spinal spondylosis (Tr. 284).

Treating records from the same month note that physical therapy and chiropractic treatment administered after the December, 2010 accident made the condition worse (Tr. 269). Plaintiff demonstrated 5/5 motor strength (Tr. 269).

January, 2014 records note that Plaintiff attributed the sarcoidosis in part to the fact that he "lived very close to [the] World Trade Center and was exposed to dust . . ." (Tr. 345). Plaintiff reported increased shortness of breath and cloudy vision in the past fall (Tr. 344). In November, 2014, Plaintiff reported that he developed a cold after attending an engagement party in New York and the following week, developed allergy symptoms "after working in a studio where he was exposed to a dog" (Tr. 324). Plaintiff reported that he had been unable to work for the past month and doubted that he could "play a local show" the following night (Tr. 324). The following month, Dr. Angel opined that Plaintiff would be expected to miss more than four days of work each month due to sarcoidosis and the related conditions of arthritis and difficulty breathing (Tr. 354). Due to spinal stenosis and a meniscal tear, she found that Plaintiff was limited to lifting 10 pounds and walking/standing less than two hours a day (Tr. 353). She found that Plaintiff required a sit/stand option and was limited to frequent stooping and occasional twisting and stair climbing (Tr. 354). She found that he was unable to crouch or climb ladders (Tr. 354). The same month, Paula L. Watson, M.D. found that Plaintiff was limited to occasional manipulative activity bilaterally but was precluded from handling, fingering, and peeling with the left hand (Tr. 357). She found that Plaintiff should avoid concentrated exposure to temperature extremes, high humidity, and

perfumes; avoid even moderate exposure to solvent/cleaners and chemicals; and avoid all exposure to airborne hazards and soldering fluxes (Tr. 357).

## 2. Non-Treating Records

In November, 2013, Thomas Thrush, M.D. performed a non-examining review of the medical records on behalf of the SSA, finding that Plaintiff could not establish the presence of an impairment causing significant work-related limitation on or before June 30, 2009 (Tr. 71-72). The same month, Frank Kupstas, Ph.D. performed a non-examining review of the treating records, finding the absence of evidence of a medically determinable psychological impairment occurring before June 30, 2009 (Tr. 72).

### C. Vocational Expert

VE Rebecca Williams classified Plaintiff's past relevant work as an electronics technician as skilled and exertionally medium; musician, skilled/exertionally light; and song writer skilled/exertionally sedentary[1] (Tr. 51-52). She testified that none of the positions had transferrable skills (Tr. 52). The ALJ then described a hypothetical individual of Plaintiff's age, education, and work background:

---

[1] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

> [C]an occasionally push or pull with the right-lower extremity. This person should perform no frequent, forceful gripping, or grasping with the hands. And if you want an example . . . what comes to mind is like somebody turning one of those big metal cog wheels, you know, on a frequent basis. So that's what I see as forceful gripping or grasping. You may have a different understanding of that. This person can occasionally operate foot controls with the right-lower extremity. This same person can never climb ladders; ropes; or scaffolding; and can occasionally perform all other postural activities. And, finally, this person should avoid concentrated exposure to pulmonary hazards and work place hazards [of] "chemicals or gasses" [and] "unprotected heights and moving machinery" (Tr. 52-53).

The VE testified that the above limitations would not preclude any of Plaintiff's past relevant work (Tr. 54). The VE then testified that if the same individual were further limited to lifting 20 pounds occasionally and 10 frequently, the individual could perform Plaintiff's past relevant work as a musician and song writer (Tr. 54).

The ALJ then posed another set of limitations: Less than two hours of standing and walking each day with a sit/stand at will option; a preclusion on crouching and pulmonary hazards; frequent stooping; occasional twisting, climbing, and use of hands; avoidance of concentrated exposure to extremes of temperature and high humidity; and the need to miss more than four days of work each month (Tr. 55-56). The VE responded that the last set of limitations would preclude all work (Tr. 56).

**D. The ALJ's Decision**

Citing the medical transcript, ALJ Neuhoff found that on or before the DLI of June 30, 2009, Plaintiff did not experience any medical impairments which "significantly limited the ability to perform basic work-related activities for 12 consecutive months" (Tr. 14). The

ALJ cited Plaintiff's testimony that the alleged onset date of January, 2008 "was wrong and . . . that he did not become disabled until December of 2010 which is after the [DLI]" (Tr. 15, 29). She noted that Plaintiff stated that "he did not become incapacitated" by sarcoidosis until December, 2010 (Tr. 15). She noted further that "the actual medical evidence of record begins in January of 2011, which provides additional support for the [Plaintiff's] admission that he did not become disabled until after [the DLI] and provides support for the conclusion that there was no severe impairment in existence prior to the [DLI]" (Tr. 15). She observed that there was "no evidence for the period from his alleged onset date to the [DLI] of June 30, 2009" (Tr. 16). She noted that medical source statements from December, 2014 were irrelevant to Plaintiff's condition on or before June 30, 2009 (Tr. 16). In closing, she noted that her finding that Plaintiff did not experience any work-related impairment for the relevant period was supported by the non-examining assessments (Tr. 16).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the

residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

Plaintiff, now proceeding *pro se,* claims, in effect, that he was denied a full and hearing at the administrative level. He argues first that at the time of the hearing, he "was confused about the meaning of [onset of disability] and accidentally gave inaccurate testimony that went unchallenged" by his attorney. *Plaintiff's Brief,* 2, *Docket #21,* Page ID 426. He notes that he did not meet or speak with his attorney until 10 minutes before the hearing. *Id.* He notes that no one asked him about his "medical records/functionality" prior to the June 30, 2009 expiration of benefits. *Id.* He contends that his attorney was unprepared. *Id.* at 3. He argues that although the question of whether he had also filed for SSI was unresolved, the ALJ erred by declining to reschedule the hearing, "[e]ven if a postponement might have been in [Plaintiff's] best interest." *Id.* He contends that although he testified that the condition of sarcoidosis "started getting apparent" in 2008, 2009s," his attorney failed to develop his testimony regarding his condition prior to the June 30, 2009 expiration of benefits. *Id.* at 4. He contends that in actuality, he was disabled much earlier, noting that beginning in 2004, he did not have any taxable earnings aside from "some occasional passive income from song royalties and equipment rental." *Id.* He notes that while he was promised that he would be contacted for the purpose of amending his onset date, he never received the promised information. *Id.* at 5. Finally, he contends that the VE's

testimony supports the position that his limitations would preclude all gainful employment. *Id.*

An ALJ is required to ensure the claimant receives a full and fair hearing. *Lashley v. Secretary of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). However, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant." *Landsaw v. Secretary of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). The ALJ has a heightened duty to develop the administrative record "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures. *Wilson v. Commissioner of Social Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. May 29, 2008)(*citing Lashley*, 708 F.2d at 1051-52).

The Court has carefully considered Plaintiff's claims or error but concludes that they do not warrant remand or reversal of the administrative findings.[2]

---

[2] The pleadings of a pro se litigant are to be liberally construed. *See Martin v. Overton*, 391 F.3d 710, 712 (6th Cir.2004)(*citing Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); *Herron v. Harrison*, 203 F.3d 410, 414 (6th Cir.2000) (pro se pleadings are held to "an especially liberal standard"). Further, in Social Security cases, the failure to submit a brief or a full blown legal argument "[is] not a prerequisite to the Court's reaching a decision on the merits" or a finding, sua sponte, that grounds exist for reversal. *See Wright v. Commissioner of Social Sec.* 2010 WL 5420990, *2 –3 (E.D.Mich.2010)(Friedman, J.).

First, Plaintiff's claim that he was unaware of the import of the June 30, 2009 DLI at the time of the hearing does provide grounds for remand. As set forth in Sections I., II.A., *above,* Plaintiff, then unrepresented, filed a DIB claim on April 8, 2013, alleging that he became disabled on December 9, 2010 (Tr. 142). While Plaintiff blames his lawyer (whose firm was retained shortly after he made his application) for failing to note that he was required to establish disability on or before June 30, 2009, the ALJ noted that the alleged onset date was apparently amended to January 1, 2008 by the time of the hearing (Tr. 29). Further, as discussed further below, the transcript does not suggest that the lawyer was unprepared.

To the contrary, the DIB claim was primarily defeated by Plaintiff's own testimony: As recounted above, he contradicted the ALJ's assumption that he was alleging disability as of January 1, 2008, stating instead that he did not become disabled until "around December of 2010" (Tr. 29). The ALJ correctly noted that Plaintiff's testimony that he did not become disabled until almost 18 months after the expiration of DIB constituted substantial evidence in support of the non-disability finding (Tr. 15).

Plaintiff's contention that he would have testified differently had he known that he had to show disability on or before June 30, 2009 is not well taken. The fact that as a layperson, he was apparently unaware that he needed to establish disability before June 30, 2009 for an award of DIB does not invalidate his testimony that he did not become disabled until December, 2010. Plaintiff's claim that his lawyer and/or the ALJ was at fault for

failing to develop the record is equally meritless. It is unclear how his lawyer could have rehabilitated her client after his bald statement that he did not become disabled until almost 18 months after the expiration of DIB. Plaintiff argues that his lawyer ought to have developed his testimony that his condition actually worsened in 2008 and 2009 (Tr. 30). However, his hearing testimony does not suggest disability before the DLI. The record shows that Plaintiff attributed the erroneous January 1, 2008 alleged onset of disability date to the fact that the condition of sarcoidosis "started getting apparent in 2008, 2009" (Tr. 30). Plaintiff's testimony cannot be construed to imply that he was disabled earlier than December, 2010 but rather, to offer an explanation for the earlier, incorrect onset date.

Moreover, the record shows that both Plaintiff's attorney and the ALJ (while forced to "change gears" after Plaintiff's surprise statement that he was not disabled until December, 2010) then discussed at length Plaintiff's eligibility for SSI (Tr. 31-34).[3] The ALJ noted that while Plaintiff had recently "attempted" to file a claim for SSI, at the time of the hearing,

---

[3] Entitlement to DIB under Title II of the Social Security Act is based on a finding of medical disability and a claimant's earning record. "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage' to total quarters." *Arnone v. Bowen*, 882 F.2d 34, 37 (2nd Cir.1989) (*citing* 42 U.S.C. § 423(c)(1)(B); 20 C.F.R. § § 404.101(a), 404.130–404.133). "'Quarters of coverage' include quarters in which the applicant earned certain amounts of wages or self-employment income." *Id.* (citing 20 C.F.R. §§ 404.101(b), 404.140–404.146. To be entitled to DIB, a claimant must show that he was disabled prior to his [DLI]. 20 C.F.R. § § 404.315(a)(1), 404.320(b)(2). In contrast, for an award of SSI benefits under Title XVI, a claimant must establish disability and financial need. *Willis v. Sullivan*, 931 F.2d 390, 392, fn. 1 (6th Cir.1991); 42 U.S.C. § 1382.

there was "no notice of a disapproved claim" (Tr. 33).[4]  Although Plaintiff argues that the ALJ ought to have postponed the hearing, he does not argue how a postponement would have improved his chances of an award of DIB.

Aside from Plaintiff's flat denial of disability prior to December, 2010, the transcript does not contain *any* treating records predating the DLI of June 30, 2009 although he was informed of the need for medical records from the relevant period on multiple occasions (Tr. 81, 158, 177).  Between the absence of evidence for the period predating the expiration of entitlement to DIB and his testimony that he was not disabled until almost 18 months later, he has failed to meet his burden to establish disability.  *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990)(Claimant bears "the ultimate burden" to show disability).

Despite the absence of evidence for the relevant period, I have reviewed the material created from January, 2011 forward for some reference to Plaintiff's condition on or before June 30, 2009.  These records do not cast doubt on the ALJ's findings.  January, 2011 records note Plaintiff's report that "he was well until" a December 9, 2010 car accident (Tr. 315).  An October, 2013 treating assessment by Dr. Guy attributed Plaintiff's "partial disability" to the December 9, 2010 car accident (Tr. 284-285).  Dr. Angel's December, 2014 assessment attributes Plaintiff's exertional and postural limitations to a knee injury which occurred after the expiration of benefits (Tr. 353-354).  Likewise, Dr. Watson's December,

---

[4]The current transcript does not contain an application of SSI (Tr. 152).  Moreover, Plaintiff states presently that his claims of error pertain only to the DIB claim.  *Plaintiff's Brief* at 3.

2014 finding of manipulative limitations appear to be solely attributal to neck and upper extremity problems brought on by the December, 2010 accident (Tr. 357).

Likewise, Plaintiff's argument that the VE's testimony supports his disability claim does not provide grounds for remand. The VE testified that a hypothetical individual requiring more than four absences a month would be unable to perform any gainful employment (Tr. 56). Plaintiff's reliance on this testimony fails for multiple reasons. First, the VE's testimony was given in response to the ALJ's reading of the limitations found by Drs. Angel and Watson in December, 2014 - over five years after the DLI (Tr. 55).[5] The ALJ explicitly declined to adopt either of the treating assessments because they were composed long after the relevant period ended (Tr. 16). *See Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir.1994)(ALJ not required to adopt properly discredited findings). Second, the ALJ's finding that Plaintiff was not disabled at Step Two foreclosed the need for vocational testimony which comes into play only at Step Four or Five of the sequential analysis. As such, Plaintiff's claim for remand based on the vocational testimony does not warrant a remand.

However in closing, it should be noted that my recommendation to uphold the administrative decision should not be read to trivialize Plaintiff's current physical and psychological problems. Indeed, the record shows a worsening of his condition following

---

[5]The ALJ made clear that the limitations posed were drawn from "Exhibits 5F and 6F" which consist of Drs. Angel and Watsons' assessments (Tr. 353-358).

the December, 2010 car accident. However, the ALJ's determination that Plaintiff was not disabled prior to June 30, 2009 is supported by substantial evidence, and is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level. Therefore, it should therefore not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI. CONCLUSION

For these reasons, I recommend that Plaintiff's Motion for Summary Judgment [Docket #21] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                              s/ R. Steven Whalen
                                              R. STEVEN WHALEN
                                              UNITED STATES MAGISTRATE JUDGE

Dated: April 25, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on April 25, 2018, electronically and/or by U.S. mail.

                                              s/Carolyn M. Ciesla
                                              Case Manager to the
                                              Honorable R. Steven Whalen